# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-2451

_____

United States of America,     *
                            *

         Appellee,     *

                            *    Appeal from the United States
     v.                       *    District Court for the District
                            *    of Minnesota.

Gary Lee Wipf,     *

                            *

         Appellant.     *

_____

Submitted: October 22, 2004
Filed: February 16, 2005

_____

Before MORRIS SHEPPARD ARNOLD, JOHN R. GIBSON, and SMITH, Circuit
Judges.

_____

SMITH, Circuit Judge.

Gary Wipf was convicted of multiple counts of aggravated sexual abuse and a single count of sexual abuse in the United States District Court.[1] For reversal, Wipf argues that his Fourth, Fifth, and Sixth Amendment rights were violated. We find no error and affirm.

--------

[1]Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

## I. *Background*

On April 4, 2002, twenty-one-year-old J.D. reported to Pat Mills, the Director of Public Safety of the Red Lake Tribal Police Department, that he had been molested by Gary Wipf during the time he attended St. Mary's Mission School on the Red Lake Indian Reservation in the early 1990s. J.D. explained that the molestation began while he was in the fourth grade and ceased at the end of his fifth-grade year. According to J.D., Wipf had taken explicit photographs of him and other young boys Wipf had molested. J.D. described multiple occasions of sexual activity including oral and anal sex at Wipf's residence, church, and school. In addition, J.D. explained that Wipf had videotaped him performing sexual acts.

Investigator Jason Lawrence, who was assigned to J.D.'s case, interviewed St. Mary's school counselor, Victoria Graves. Lawrence learned that Wipf held a position as a custodian and as a gym teacher for St. Mary's from 1990 through 1993, and from 1997 through the fall of 2001. From 1997 through 2001, Wipf coached St. Mary's boys' fifth-grade basketball and tribal youth recreation teams. Graves gave Lawrence the names of other boys linked to Wipf through St. Mary's.

Using these names, Lawrence interviewed two of the young men and then again talked to J.D. about Wipf. At this meeting, J.D. identified several additional boys who he suspected Wipf had abused. Lawrence then obtained tribal search and arrest warrants for Wipf's residence and person. At the time of his arrest, Wipf was on a game trip in Bemidji, Minnesota, with the St. Mary's fifth-grade basketball team. Wipf was found in a hotel room sharing a bed with one young boy and accompanied by four other young boys.

On that same day, Lawrence executed the search warrant at Wipf's home. During the search, Lawrence seized a number of videotapes, thirty-four rolls of undeveloped film, and thirty-two photo albums filled with photos of young boys. Police then obtained a second tribal search warrant for viewing the seized videotapes.

One videotape contained graphic pornographic images of Wipf sexually assaulting a young boy identified as G.A.S.

Local authorities notified the Federal Bureau of Investigation (FBI). Based upon violation of federal child pornography laws, FBI Special Agent John Englehoff and Lawrence arrested Wipf, who had been released on bond, at his residence. Following arrest, Wipf was read his *Miranda* rights and transported to the Red Lake Law Enforcement Center.

At the Red Lake Law Enforcement Center, Englehoff and Lawrence interviewed Wipf. Englehoff reintroduced himself and Wipf asked, "Do I get a lawyer?" Englehoff advised Wipf that he would receive counsel, but Englehoff first wanted to advise Wipf of his *Miranda* rights, tell him the situation, and explain the charges against him. Englehoff then told Wipf that he had been arrested for possession of child pornography based on a number of tapes that had been seized from his home. At that point, Wipf said something to the effect of "you got me," or "you caught me." Wipf explained that he did not want to answer any questions, but Englehoff requested that Wipf reconsider his request for an attorney and talk to him about the victims who may require counseling. Wipf requested an attorney and the encounter ended.

Later, Englehoff arranged for J.D. and other juveniles to be interviewed by Dr. Darryl Zitzow, a psychologist. Confronted by Dr. Zitzow with the existence of video tapes, one of the interviewees, G.A.S., recounted how Wipf molested him.

Originally, a one-count indictment was filed in the District of Minnesota charging Wipf with possession of child pornography. Wipf immediately filed a motion to suppress his inculpatory custodial statement and filed a separate suppression motion for the evidence seized from his home. Following a hearing, Magistrate Judge Erickson recommended that Wipf's suppression motion be denied

with respect to the custodial statements, but that the motion be granted with respect to the evidence seized from Wipf's home. The district court adopted the Magistrate Judge's recommendations.

The government filed a nine-count superseding indictment in the District of Minnesota charging Wipf with possession and manufacturing of child pornography; aggravated sexual abuse of J.D., a minor; sexual abuse of G.A.S., a minor; and transportation of a minor with intent to engage in sexual activity. Prior to trial, the government moved to dismiss the charges of possession and manufacturing of child pornography as they were predicated on evidence suppressed by the district court. In addition, the district court dismissed the charge of transportation of a minor with intent to engage in sexual activity. A jury convicted Wipf on the remaining charges, and the district court sentenced him to 480 months' imprisonment for the three counts of aggravated sexual abuse of J.D., and 180 months' imprisonment for the sexual abuse of G.A.S., all to be served concurrently.

## II. *Discussion*
### A. *Confrontation Clause and Hearsay*

Wipf first argues that the district court violated his Sixth Amendment right to confront witnesses by allowing Dr. Zitzow to testify about his interviews with J.D. and G.A.S. For support, Wipf points to *United States v. Sumner*, 204 F.3d 1182, 1185 (8th Cir. 2000), where we held that the admission of a child-victim's hearsay statement to a clinical psychologist violated the Sixth Amendment Confrontation Clause. However, the child victim did not testify at trial in *Sumner*. We have explained that "the Confrontation Clause is . . . satisfied when the hearsay declarant testifies at trial and is available for cross-examination." *Bear Stops v. United States*, 339 F.3d 777, 781 (8th Cir. 2003). In this case, both J.D. and G.A.S. testified at trial

and were available for cross-examination. Wipf has shown no violation of the Confrontation Clause with respect to Dr. Zitzow's testimony.[2]

Wipf also claims that the district court erred in admitting the statements of J.D. and G.A.S. under the medical diagnosis and treatment exception to the hearsay rule. *See* Fed. R. Evid 803(4). Even if a district court errs with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless. *United States v. Lupino*, 301 F.3d 642, 645 (8th Cir. 2002). An evidentiary error is harmless if the substantial rights of the defendant were unaffected and the error did not influence or had only a slight influence on the verdict. *United States v. Blue Bird*, 372 F.3d 989 (8th Cir. 2004). In this case, the trial testimony of both G.A.S. and J.D. mirrored the testimony of Dr. Zitzow. As such, Dr. Zitzow's testimony was merely cumulative and did not likely influence the jury. *See, e.g., United States v. Balfany*, 965 F.2d 575 (8th Cir. 1992) (holding erroneous admission of child victim's hearsay statements to aunt was cumulative and, therefore, harmless in prosecution for aggravated sexual assault).

## B. *Limitation on Cross-Examination*

For his second point on appeal, Wipf contends that the district court impermissibly restricted his cross-examination of J.D. The United States Supreme Court has emphasized that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original). Thus, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment,

---

[2]Recently, the United States Supreme Court held that the Confrontation Clause bars the admission of out-of-court testimonial statements unless the declarants are unavailable and the defendant had a prior opportunity to cross-examine them. *See Crawford v. Washington,* 541 U.S. 36 (2004). *Crawford* is inapplicable to the facts of this case.

-5-

prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986); *see also Newton v. Kemna*, 354 F.3d 776, 781 (8th Cir. 2004). We review a district court's decision to limit cross-examination for an abuse of discretion, reversing only if there has been clear abuse of discretion and a showing of prejudice to the defendant. *United States v. Cody*, 114 F.3d 772 (8th Cir. 1997).

Following direct examination of J.D., Wipf sought to discredit him and establish a sinister motive for J.D.'s reporting Wipf's sexual abuse to authorities. According to Wipf, J.D. made the sexual-abuse claim in an attempt to exculpate himself from an alleged sexual assault. Wipf had only an unsubstantiated allegation found in a police report to support this impeachment theory. At the time J.D. made his report of abuse, he was neither under investigation nor suspected of any criminal activity. Given the lack of supporting evidence, we cannot say the district court abused its discretion in limiting this line of questioning.

Wipf relies on *United States v. Love*, 329 F.3d 981 (8th Cir. 2003), where we held that a defendant's right of confrontation was violated in a prosecution for being a felon in possession of a firearm. The district court prohibited cross-examination of a key government witness as to his mental defects. *Id.* The witness testified that he observed the defendant with firearms, but the witness had been diagnosed with a short-term and a long-term memory impairment six years earlier. *Id.* The facts in this case are not analogous. First, impeachment based on motive does not approximate questioning a witness's ability to remember. Second, in *Love*, the defense had admissible evidence of the witness's memory impairment; here, Wipf provided no evidence supporting the allegation that J.D. had committed sexual abuse.

Other courts have affirmed a trial court's limitation of cross-examination based on unsupported allegations. *See United States v. Lo,* 231 F.3d 471, 482–83 (9th Cir. 2000) (affirming limitation on cross-examination into fraud allegations because of

"the highly speculative nature" of those allegations); *United States v. Adams*, 216 F.3d 1073 (2nd Cir. 2000) (holding that although the fact that a witness was under current investigation might reveal a possible motivation for untruthfulness, the underlying facts of the claim were of minimal or no probative value, and admitting such evidence would have risked a peripheral trial on the external allegation). Furthermore, the district court granted Wipf considerable leeway to cross-examine J.D. and to impeach his credibility. Accordingly, we affirm on this point.

## C. *Exclusion of Evidence*

In his third point on appeal, Wipf contends that the district court erred when it failed to exclude the testimony of G.A.S. According to Wipf, police only acquired G.A.S.'s testimony through an illegal search of his home. Wipf argues that because the police identified G.A.S. as a victim from a seized videotape suppressed by the district court, G.A.S.'s trial testimony was "fruit of the poisonous tree," and, therefore, inadmissible. Under the "fruit of the poisonous tree" doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality. *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987) (en banc) (citing *Wong Sun v. United States,* 371 U.S. 471, 484–88 (1963)). However, challenged evidence derived through police illegality will still be admissible under the "attenuation" doctrine if the causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint. *Id*. (citing *United States v. Ceccolini,* 435 U.S. 268, 273–80 (1978)).

In *Ceccolini*,[3] the Supreme Court set forth an analytical framework to evaluate the admissibility of live witness testimony under the attenuation doctrine. *Id.* at 274–79. The Court emphasized that live witness testimony should be excluded when "the basic purpose of the exclusionary rule will be advanced by its application" in a particular case. *Ceccolini*, 435 U.S. at 276. Two important considerations are the costs of permanently disabling a witness from testifying and the degree of free will exercised by the witness in testifying. *Id.* at 276–78. The Court reasoned that where the cooperation of a witness is in fact the result of an exercise of the individual's free will, unaffected by police misconduct, the purpose of the exclusionary rule would not be served by disallowing the testimony. *Id*. In determining the strength of the link between the illegality and a witness's testimony, *Ceccolini* directs us to consider (1) the stated willingness of the witness to testify, (2) the role played by the illegally seized evidence in gaining the witness's cooperation, (3) the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial, and (4) the police motivation in engaging in the illegal conduct. *Hamilton*, 809 F.2d at 476.

---

[3]A police officer, while taking a break in the defendant's business shop, noticed an envelope containing money lying on the cash register. *United States v. Ceccolini*, 435 U.S. 268 (1978). Upon closer examination, the officer found that the envelope also contained slips of paper indicating unlawful gambling activity. *Id.* The officer questioned one of the defendant's employees, who explained that the envelope belonged to the defendant. *Id*. That information was forwarded to an FBI agent, who later interviewed the employee without referring to the incident involving the police officer. *Id.* The defendant later testified falsely before a federal grand jury that he had never been involved in any way with gambling operations. *Id.* The defendant's employee testified for the prosecution at a subsequent trial for perjury. *Id*. Prior to trial, the defendant sought to suppress his employee's testimony as "fruit of the poisonous tree." *Id*. The trial court granted the motion, reasoning that the employee-witness "first came directly to the attention of the government as a result of an illegal search." *Id.* at 273. The court of appeals affirmed, but the United States Supreme Court reversed. *Id*.

Our review of the record convinces us that G.A.S. testified willingly. G.A.S. took the stand and gave the same account of his relationship with Wipf that he gave to Dr. Zitzow. *See Satchell v. Cardwell*, 653 F.2d 408, 409–10 n.7 (9th Cir. 1981) *cert. denied*, 454 U.S. 1154 (1982) (explaining that the attenuation doctrine would apply where a brutally beaten multiple-rape victim would probably have come forward to testify even if she had not been discovered as the result of an illegal entry). Moving to the second consideration, we note that the illegally seized tapes were indirectly used to get G.A.S. to talk with Dr. Zitzow. Specifically, both G.A.S.'s parents and Dr. Zitzow confronted G.A.S. with the existence of the videotape before G.A.S. came forward. However, the videotape was never shown to G.A.S. and law enforcement never confronted G.A.S. with the existence of the videotape. With respect to the temporal element enunciated in *Ceccolini*, approximately nine to twelve days elapsed between the time of the illegal search and first contact with G.A.S. From that point, about nine months passed before G.A.S. was called to testify at trial.

Lastly, the record reveals that the police did not search Wipf's residence to identify other victims or witnesses. Rather, the search was done in response to J.D.'s claim of molestation and was an attempt by police to corroborate J.D.'s claim. The Supreme Court has noted that "the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify." *Ceccolini*, 435 U.S. at 277. We hold that there was sufficient attenuation to allow G.A.S. to testify at trial.

### D. *Fifth Amendment Right Against Self-Incrimination*

Wipf next argues that the district court erred in admitting his incriminating statement made to police after Wipf requested an attorney. After being taken into custody at the police station, Wipf asked Englehoff, "Do I get a lawyer?" Englehoff advised Wipf that he would receive counsel, but Englehoff first wanted to advise Wipf of his *Miranda* rights, tell him the situation, and explain the charges against him. Englehoff then told Wipf that he had been arrested for possession of child

pornography based on a number of tapes that had been seized from inside his home. At that point, and without provocation, Wipf made the incriminating statement "you got me," or "you caught me."

The United States Supreme Court has held that, "[if an] individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona,* 384 U.S. 436, 474 (1966); *see also Edwards v. Arizona,* 451 U.S. 477 (1981). Interrogation, properly understood, involves either "express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291 (1980). Accordingly, interrogation encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

The First Circuit has stated that a "law enforcement officer's mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory." *United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998) (citing *United States v. Trimble*, 986 F.2d 394, 401 (10th Cir. 1993); *United States v. Payne,* 954 F.2d 199, 203 (4th Cir. 1992); *United States v. Jackson,* 863 F.2d 1168, 1172 (4th Cir. 1989)). Furthermore, an inculpatory statement is not considered the product of custodial interrogation merely because it is made after the suspect has been told the charges against him. *See People v. Rivas*, 13 P.3d 315, 319 (Colo. 2000); *Conley*, 156 F.3d at 83.

Under these circumstances, we cannot say that Englehoff's statement that he wanted to tell Wipf "the situation, and explain the charges against him," amounts to custodial interrogation. Accordingly, the district court did not err in allowing Wipf's statements into evidence.

## E. *Right to Jurors from Specific Division*

For his final point on appeal, Wipf contends that the district court erred by failing to summon a jury panel from the Sixth Division of the District of Minnesota, the division where Wipf committed the crime. We have stated that:

> The Sixth Amendment to the United States Constitution requires that a trial be held in the state and district where the crime was committed. However, a defendant does not have a right to be tried in a particular division.

*United States v. Davis*, 785 F.2d 610, 616 (8th Cir. 1986). Wipf attempts to distinguish the law of this circuit, arguing that while the trial location is within the discretion of the district court, a defendant has a right to have jurors summoned from a geographic boundary of a specific judicial division. We refuse to create such a distinction. The Sixth Amendment does not require jurors to be summoned from a particular division.

## III. *Conclusion*

For the foregoing reasons, we affirm Wipf's conviction and sentence.

_____